IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


UNITED STATES OF AMERICA,      ]
                               ]      DOCKET No. 4:12CR10013-001
               Plaintiff,      ]
vs.                            ]
                               ]      El Dorado, AR
MARCUS TYRONE WAYNE,           ]
                               ]
               Defendant.      ]      July 31, 2012


TRANSCRIPT OF FIRST APPEARANCE AND BOND HEARING
BEFORE THE HONORABLE BARRY A. BRYANT,
UNITED STATES MAGISTRATE JUDGE.



Appearances:

For the Government:        CONNER ELDRIDGE
                           UNITED STATES ATTORNEY
                           By: Matthew C. Quinn, Esquire
                           Assistant U.S. Attorney
                           500 State Line Ave., Suite 402
                           Texarkana, AR  71854


For the Defendant:         LAW OFFICES OF CLARK BIRDSALL
                           By:  Clark E. Birdsall, Esquire
                           9110 Seyene Rd.
                           Dallas, TX  75227

                           L. MICKELE DANIELS ASSOCIATES
                           By:  L. Mickele Daniels, Esquire
                           One Arena Place, Suite 580
                           7322 Southwest
                           Houston, TX  77074

                           LAW OFFICE OF FRANK A. PEREZ
                           By:  Frank A. Perez, Esquire
                           9110 Seyene Rd.
                           Dallas, TX  75227

Transcribed by
Court Reporter:          Donna S. McKinney, CCR-M
                         U.S. District Court
                         101 S. Jackson, Suite 306
                         El Dorado, AR  71730
                              (870)862-1303


*RECORDED BY DIGITAL RECORDING; TRANSCRIBED FROM DICTATION.*

# I N D E X

Initial Appearance                                    4

Bond Hearing                                         10

Government's Proffer of Proof                        10


Defendant's Witness:

Michelle Wayne

      Direct Examination                        14

      Cross Examination                         22

Defendant's Proffer                                  25


Argument:

      Mr. Quinn                                 25

      Mr. Birdsall                              27


Court's Ruling                                       29


Reporter's Certificate                               35

1                          July 31, 2012

2              **THE COURT:**  Ms. Gallagher, do you want to call this

3    next matter we have set this morning.

4              **MS. GALLAGHER:**  The Court calls the case of United

5    States versus Marcus Tyrone Wayne, Cause No. 1:12CR10013.

6              **THE COURT:**  Mr. Wayne, just have a seat at counsel

7    table right here, please.

8        Gentlemen, you may just have a seat.

9        Mr. Quinn, is the government ready to proceed in this

10   matter?

11             **MR. QUINN:**  Yes, Your Honor.

12             **THE COURT:**  And on behalf of the defendant, I'm not

13   sure I know who all the players are today.  Who is going to be

14   speaking on behalf of the defendant?

15             **MR. BIRDSALL:** Clark Birdsall, Your Honor.

16             **MR. DANIELS:** Good morning, Your Honor, Mickele,

17   M-I-c--k-e-l-e, Daniels.

18             **THE COURT:**  We've met, Mr. Daniels.

19             **MR. DANIELS:**  Yes, sir.

20             **THE COURT:**  All right.

21             **MR. PEREZ:**  Frank Perez, I've filed a motion to

22   withdraw, Your Honor.

23             **THE COURT:**  Mr. Perez, I believe that motion, Judge

24   Hickey indicated that motion would be granted.  The order will

25   be entered today, I believe.

1        Is the defendant ready to proceed this morning?

2            **MR. BIRDSALL:**  He is ready, Your Honor.

3            **THE COURT:**  Mr. Wayne,  we are here this morning for

4    an initial appearance pursuant to Rule 5 of the Federal Rules of

5    Criminal Procedure.  Your initial appearance and arraignment

6    today is as a result of an indictment that has been returned by

7    the United States Grand Jury for the Western District of

8    Arkansas, El Dorado Division.  You've been indicted by the grand

9    jury for violation of federal criminal law.  There are two

10   counts in that indictment, two charges along with a forfeiture

11   count.  We'll go over those a little more specifically here in

12   just a moment.

13       I know you have appeared in this court at least on one

14   occasion in the past, Mr. Wayne.  I want to assure myself,

15   before we go any further, that you are competent and that you

16   are able to understand what I am saying and what we're doing

17   here today.  So I have just a couple of questions for you in

18   that regard.

19       How old are you, Mr. Wayne?

20           **THE DEFENDANT:**  Thirty-five.

21           **THE COURT:**  And if you would just speak up just a

22   little bit, pull that microphone forward there.

23       Mr. Wayne how far did you go through school, sir?

24           **THE DEFENDANT:**  Twelfth grade.

25           **THE COURT:**  And I take it from that you can read and

1  write the English language; is that correct, sir?

2         **THE DEFENDANT:** Yes, sir.

3         **THE COURT:** And I know you have been in custody at

4  least for some period of time, Mr. Wayne, and so my question

5  regarding that is, prior to coming into court today, have you

6  consumed any alcohol or taken any medication, anything like that

7  that would interfere with your ability to understand what's

8  going on today?

9         **THE DEFENDANT:** No, sir.

10         **THE COURT:** All right.

11      Now you've been charged, as I said, by indictment in this

12  matter with violating federal criminal law.  My question to you

13  now is, have you seen a copy of that indictment in this case?

14         **THE DEFENDANT:** Yes, sir.

15         **THE COURT:** All right, and have you had a chance to at

16  least in some fashion to review that, read over it, before we

17  started court today?

18         **THE DEFENDANT:** No, sir.

19         **THE COURT:** Do you have a copy there in front of you?

20         **MR. BIRDSALL:** I'm looking for it right now, Your

21  Honor, I don't think I do have a copy.

22      That has changed.

23         **THE COURT:** Mr. Wayne, if you would, take a second and

24  look over that indictment, particularly Count 1 and Count 2 of

25  that indictment.

1    Have you had a chance to review that?

2              **MR. BIRDSALL:**  I have, Your Honor.

3              **THE COURT:**  All right, thank you.

4    Now, Mr. Wayne, before we go any further, I would advise

5    you that you are not required to make any statement regarding

6    those charges contained in the indictment.  Anything you were to

7    say about those charges could, and probably would, be used

8    against you.  Do you understand that you have the right to

9    remain silent in this matter?

10             **THE DEFENDANT:**  Yes, sir.

11             **THE COURT:**  And I would just note for the record, I

12   believe that you have with you today Mr. Daniels, Mr. Birdsall

13   and Mr. Perez, three lawyers, all of whom have been retained by

14   you or your family.  Is that correct, sir?

15             **THE DEFENDANT:**  Yes, sir.

16             **THE COURT:**  All right.  Now as I said, you are charged

17   in this indictment with two counts.  And just briefly, Count 1

18   charges you with conspiracy to distribute more than 280 grams of

19   cocaine base, or crack cocaine, in violation of Title 21 of the

20   United States Code §846.

21   Count 2 charges you with conspiracy to possess, with intent

22   to distribute, more than 5 kilograms of cocaine, Title 21 United

23   States Code §846.

24   Additionally, there is a forfeiture allegation contained in

25   the indictment.

1  Now today is your first appearance in this court on these

2  charges.  Today is not a trial.  Today is simply my chance to

3  make sure you understand what the charges are against you.  And

4  in that light, I can ask Mr. Quinn, the prosecutor here today,

5  to read the indictment to you word for word.  However, if you

6  have reviewed it yourself and you understand the charges you can

7  waive reading of the indictment.  How would you like to proceed

8  with that?

9  **THE DEFENDANT:**  I'll waive it.

10  **THE COURT:**  You understand what you're charged with

11  here?

12  **THE DEFENDANT:**  Yes.

13  **THE COURT:**  All right, at this time then, I'm going to

14  ask Mr. Quinn to summarize for you what the possible punishment

15  would be if you were found guilty of either of the two charges

16  in this case.  So listen very carefully.

17  Mr. Quinn.

18  **MR. QUINN:**  Your Honor, both charges carry the same

19  penalty range of not less than 10 years, nor more than life

20  imprisonment.  Not more than a $10 million fine, or both.  A

21  possible term of supervised release, and a $100 special

22  assessment.

23  **THE COURT:**  Mr. Wayne, do you understand, sir, that if

24  you were found guilty of either of these two charges, that the

25  mandatory minimum sentence would be 10 years in a federal

1  prison.  Do you understand that?

2        **THE DEFENDANT:**  Yes, sir.

3        **THE COURT:**  All right.  At this time I'm going to ask

4  you to enter a plea to these two charges.  Either you or your

5  counsel may enter that plea.  How does the defendant plea to the

6  charges in the indictment, guilty or not guilty?

7        **MR. BIRDSALL:**  Your Honor, he pleads not guilty.

8        **THE COURT:**  Thank you.

9    All right, gentlemen, a not guilty plea has been entered on

10  behalf of the defendant in this case.  This matter is set for

11  trial before United States District Judge Susan Hickey here in

12  El Dorado on September 12, 2012 at 9:00 a.m.  A pretrial

13  scheduling order will be entered in this matter electronically,

14  as is the court's usual practice.

15    Gentlemen, I know that counsel, you haven't appeared, at

16  least I don't think you've appeared before me before in the

17  Western District.  We have a pretrial scheduling order that sets

18  out the discovery sort of process, and it is an informal process

19  unless you have a dispute.  Of course, you can file any motions

20  you need to, but the initial exchange of discovery, if you'll

21  check out that order it will explain to you how to do it, it's

22  by letter and notice as opposed to motion filing.

23        **MR. BIRDSALL:** Okay.

24        **THE COURT:**  All right, the last thing we want to talk

25  about this morning, and I believe we had initially set this

1  matter for a detention hearing today, to immediately follow the

2  arraignment.

3       Mr. Quinn, is the government ready to proceed with that

4  detention hearing?

5            **MR. QUINN:**  Yes, Your Honor.

6            **THE COURT:**  All right.

7       And Mr. Birdsall, is the defendant ready to proceed this

8  morning?

9            **MR. BIRDSALL:**  Yes, Your Honor.

10           **THE COURT:**  Mr. Wayne, we're going to proceed at this

11  time with your detention or bond hearing in this matter.

12       Mr. Quinn, you may proceed by either opening statement,

13  call your first witness, present whatever information you have.

14           **MR. QUINN:**  Thank you, Your Honor, I'm just going to

15  proceed by proffer of the evidence, Your Honor, at this time, if

16  the court will allow that.

17           **THE COURT:**  Absolutely.

18           **MR. QUINN:**  Your Honor, Mr. Wayne is indicted on two

19  counts of conspiracy, as the court just read.  One count of 280

20  grams of cocaine base, one count of conspiracy with intent to

21  distribute more than 5 kilograms of cocaine.

22       There have been numerous cooperating witnesses and

23  cooperating defendants provide information regarding Mr. Wayne

24  and his drug trafficking organization, Your Honor.  Those

25  individuals' information is that Mr. Wayne has provided at least

1   a total of 1000 ounces of crack cocaine to them over the course

2   of the conspiracy.

3       Your Honor, specifically, a cooperating source indicated

4   that he or she first began receiving crack cocaine from Mr.

5   Wayne as early as 2007 and received crack cocaine through 2010.

6   Your Honor, this source indicated he or she had received upwards

7   of several hundred ounces of crack cocaine from Mr. Wayne during

8   the course of that time period.  Mr. Wayne charged this person

9   $400 an ounce and distributed the crack cocaine in Strong,

10   Arkansas or El Dorado, Arkansas, in the Western District of

11   Arkansas.

12       Additionally, there was another cooperating source who

13   indicated that they had received powder cocaine from Mr. Wayne

14   upwards of - this source indicated he or she had spent at least

15   $250,000 on Mr. Wayne's cocaine and received multiple kilograms

16   of cocaine from Mr. Wayne.  That Mr. Wayne had a source of

17   supply on the border in Texas near Mexico and was receiving

18   anywhere from 7 to 15 kilograms of cocaine at a time for

19   approximately $25,000 a kilo, and that Mr. Wayne would then

20   distribute the cocaine to individuals in the El Dorado area and

21   would also convert or cook the cocaine into crack cocaine for

22   distribution, as well.

23       In May of this year, Your Honor, a witness, cooperating

24   witness in this case, found a bag, a child, a boy found a bag

25   containing approximately $150,000 cash underneath a trailer near

1  Mr. Wayne's property and also contained a large quantity of

2  crack cocaine.  This person took the bag and Mr. Wayne went to

3  this person's house and made contact with this minor child and

4  his parents and threatened the family if they did not return the

5  bag containing the money and the cocaine, that they would be in

6  some serious trouble.

7       Your Honor, he then got on the telephone and gave the

8  telephone to these witnesses and these witnesses indicate it was

9  a Hispanic person on the phone who indicated that the money and

10 drugs was theirs, that they were members of the Mexican maffia

11 and that they would come shoot up their house if they did not

12 listen to what Mr. Wayne was telling them.  That occurred in May

13 of this year.

14      Your Honor, on or about June 8 of this year, DEA Dallas

15 agents had cooperating source who had previously been providing

16 cocaine to Mr. Wayne and his associates in El Dorado.  They

17 arranged for a rouse delivery of approximately seven kilograms

18 of cocaine for, I believe, the price of $25,000 apiece, or

19 $26,000 apiece.  A cooperating defendant by the name of Terry

20 Gafford was arrested at that time.  He - this source and the DEA

21 delivered the rouse 7 kilograms of cocaine to a hotel room here

22 in El Dorado where Mr. Gafford was waiting for it.  Mr. Gafford

23 had approximately $215,000 cash and was arrested at the scene.

24 He indicated he was picking up the cocaine for Mr. Wayne and

25 began cooperating.  Then made recorded telephone calls to Mr.

1   Wayne indicating that he had the product, that it was red

2   labeled like he liked it, meaning the kilogram quantities of

3   cocaine had the red label writing on it, which indicated it was

4   from the Zada cartel and arranged for Mr. Wayne to meet Mr.

5   Gafford to pay the rest of the money that was owed to the

6   supplier and pick up his cocaine.

7       They then met out at a residence in El Dorado where agents

8   were waiting and Mr. Wayne brought an additional $35,000, Your

9   Honor, and met with Mr. Gafford.  This surveillance was being

10  recorded on video and Mr. Wayne was taken into custody at that

11  time attempting to purchase the kilogram quantities of cocaine.

12      Your Honor, in addition to the other witnesses who I

13  indicated before had purchased crack cocaine and powder cocaine

14  from Mr. Wayne, another cooperating individual was in Mr.

15  Wayne's residence at the end of 2011 and observed Mr. Wayne with

16  a kilogram quantity of cocaine and was in the process of

17  breaking it down and cooking it, converting it to crack cocaine

18  inside his residence.

19      Your Honor, there's a lot of cooperating individuals'

20  information.  That's just a general outline of what their

21  testimony would be, Your Honor, and what the evidence would be.

22  I think the main point of my proffer is, Judge, that Mr. Wayne,

23  according to the evidence we have, is responsible for a

24  distribution of upwards of over 100 kilograms of cocaine and

25  thousands of ounces of crack cocaine in the El Dorado Division.

1      **THE COURT:**  Thank you, Mr. Quinn.

2          Anything further at all on behalf of the government?

3      **MR. QUINN:**  That's all I have, that's all the

4  witnesses I have, except for argument.

5      **THE COURT:**  On behalf of defendant, any witnesses,

6  proffer, any information at all regarding these issues.

7      **MR. BIRDSALL:**  A little, Your Honor.

8      **THE COURT:**  You may proceed.

9      **MR. BIRDSALL:**  With the court's permission, I would

10  like to start by calling a witness, Michelle Wayne.

11      **THE COURT:**  Yes.

12          **MICHELLE WAYNE, DEFENDANT'S WITNESS, SWORN**

13                      **DIRECT EXAMINATION**

14  **BY MR. BIRDSALL:**

15  Q    Please state your name for the record.

16  A    Michelle Wayne.

17  Q    And how do you know my client, Marcus?

18  A    My husband.

19  Q    How long have you two been going together?

20  A    Since March 23, 2007.

21  Q    And you are married, is that correct?

22  A    Yes.

23  Q    How long have you been married?

24  A    Since May 6, 2008.

25  Q    During that time, y'all have lived together in the El

1   Dorado area; is that correct?

2   A     Yes.

3   Q     And have you lived at the same address that whole time?

4   A     Before I moved to El Dorado we stayed in Crossett,

5   Arkansas.

6   Q     Okay, how far is that from here?

7   A     An hour.

8   Q     All right.  Marcus has lived in this county his whole life,

9   as far as you know?

10  A     Yes.

11  Q     The two of you have a child together, is that right?

12  A     Yes.

13  Q     And he has other children that live here in the El Dorado

14  area; is that correct?

15  A     Yes.

16  Q     You've heard what the government has charged your husband

17  with, and right now the judge is trying to decide whether or not

18  to let him out on bond until these charges can be resolved one

19  way or another.  You understand that's what we're here for;

20  right?

21  A     Yes.

22  Q     One of the reasons anyway.  The judge needs to be concerned

23  that should he extend the bond to your husband that he will not

24  be a danger to the community and that he will, in fact, return

25  to court when ordered to do so.  Those are the issues, so

1    therefore, I'm going to ask you, Ms. Wayne, if the judge were to

2    allow Marcus out on a bond, would you agree, and be willing to

3    act as the eyes and the ears of the court in terms of watching

4    Marcus?

5    A    Yes.

6    Q    What would you do if you saw any evidence of his doing

7    anything suspicious that you thought could possibly be against

8    the law?  What would you?

9    A    Call the police.  I never saw him doing nothing in the

10   first place though.

11   Q    Well now, let's say - would you say that your sensitivity

12   toward any possible wrongdoing have been heighten as a result of

13   your husband being arrested?

14   A    I'm immune to the allegations.

15   Q    Well you agree to watch and report back to the court

16   anything that you view as suspicious concerning the conduct of

17   Marcus; is that correct?

18   A    Yes.

19   Q    And if the bond, the judge sees fit to extend bond to

20   Marcus, you would do everything in your power to make sure that

21   he returned to court when he was ordered to do so; would you

22   not?

23   A    Yes.

24   Q    I'm sorry, you say you have a child together, is that

25   correct?

1    A    Yes.

2    Q    And that child, his or her age?

3    A    He's one and a half.

4    Q    If Marcus gets to the street, does he have a job waiting

5    for him?

6    A    Yes.

7    Q    What would that be doing?

8    A    Working at a logging company.

9    Q    I'm sorry?

10   A    Working at a logging company.

11   Q    A what?

12   A    Logging.

13   Q    Logging?  Like wood logs?

14   A    Yes, sir.

15   Q    Okay.  And do you know what he would be doing there?

16   A    Detailing the vehicles, greasing them.

17   Q    Okay, detailing vehicles, is that right?

18   A    Washing the 18-wheelers and greasing them.

19   Q    Oh, I see.

20        Back in 2011, you're aware that a search warrant was run at

21   your house; correct?

22   A    Yes.

23   Q    And when that occurred, Marcus was not taken into custody

24   or arrested at that point; was he?

25   A    No.

1  Q    But, when that occurred, he tried to turn himself in; did

2  he not?

3  A    Yes, he did.

4  Q    What did he do to make sure that he was in compliance with

5  the law.

6  A    Well, we was at a football game and we heard they had

7  kicked our door in and that following day he went to see an

8  attorney and the attorney contacted the U.S. Marshals who

9  indicated they did not have a warrant for my husband's arrest.

10 They advised him he shouldn't leave town because he might be

11 getting indicted.

12 Q    And so he never did leave town?

13 A    No, he didn't.

14 Q    And that was about a year ago, you figure?

15 A    September.

16 Q    September 2011?

17 A    Roughly the 12th or the 13th.

18 Q    And he was arrested when?

19 A    June 9, 2012.

20 Q    So for about nine months, when told not to leave town, he

21 didn't?

22 A    No.

23 Q    Now we have today a number of family of Marcus; is that

24 correct?

25 A    Yes.

1    Q    Okay, as I understand it we've got a sister, mother,

2    father, some aunts and a cousin, have I left anybody out?

3    A    Some cousins.

4    Q    More than one cousin then?

5    A    Uh-huh.

6    Q    Is that correct?

7    A    Correct.

8    Q    So he does have a support network in the area; is that

9    correct?

10   A    Yes, sir.

11   Q    I want to talk a little bit about the medical condition of

12   Marcus for a moment, please.  Back in January of this year, as

13   siblings do, he got into an argument with his brother; is that

14   correct?

15   A    No, he didn't get in an argument with his brother.

16   Q    Okay, something happened with his brother.  Would you tell

17   the court what that was?

18   A    Well, his mother called and asked me would I tell him to

19   come pick his brother up because his brother jumped out of the

20   car and he was talking out of his mind.  They thought that if

21   Marcus came to give him a ride, he might get in the vehicle with

22   him.  And upon him arriving to give him a ride, he had retrieved

23   a handgun from somebody.  When he told him his mom wanted to

24   talk to him on the phone, he was like, no.  He seen his brother

25   reaching in his pocket, but he didn't think it was a gun and he

1  was shot, once in his face.  He tried to push the gas and his

2  brother jumped in on the side of the truck and shot him in the

3  back and he ran off the road and had a wreck.

4  Q    All right.  So Marcus was trying to come to the assistance

5  of a family situation, brother acting oddly, and he in fact,

6  shot Marcus.

7  A    Yes.

8  Q    And he has still got two bullets lodged in him; right?

9  A    Yes.

10  Q    One in the right temple and one in the second disc, C-2,

11  second disc down from the neck?

12  A    Close to his spine.

13  Q    He is in discomfort as a result of those injuries; is that

14  a fair statement?

15  A    Yes, he will be in pain for the rest of his life.

16  Q    Now that happened January 13, 2012; is that correct?

17  A    Yes, sir.

18  Q    And he spent some time in a hospital as a result of that.

19  He's had some appointments and checked back from time to time,

20  is that a fair statement?

21  A    Yes.

22  Q    So he is still undergoing examination and treatment as a

23  result of those injuries; is that correct?

24  A    Yes, to remove the bullet by his temple and for his eye.

25  Q    Well, he lost his sight as a result of the bullet that

1    lodged in his temple; is that correct?

2    A    Uh-huh.

3    Q    At least in the right eye.

4    A    Right.

5    Q    And lost his sense of smell and had some other injuries

6    that are associated with the shooting; is that right?

7    A    Yes.

8    Q    Can you think of any others?

9    A    Memory loss, confusion with his mind.  The nerves where the

10   bullet is touching is sensitive.

11   Q    Has he had chronic headaches?

12   A    Huh?

13   Q    Has he had headaches?

14   A    Yes, headaches, neck aches.

15   Q    He also has problems with his teeth.  He was undergoing

16   dental surgery at the time of the shooting, or in the process of

17   getting some problems addressed in his mouth; is that right?

18   A    Yes, prior to him getting shot he had to get some teeth

19   removed because they was decayed and once he got shot it

20   fractured the temporary teeth that the dentist put in.  He

21   couldn't go back for like a couple of months.  He couldn't

22   really open his mouth.  He is still undergoing that.

23   Q    So the bottom line is because of the shooting and now

24   because of the incarceration, he has never been able to finalize

25   the partially completed surgery on his mouth; is that correct?

1    A    Right.  They want to see him as soon as possible to finish

2    his dental work.

3    Q    They're telling him to come now; right?

4    A    Yes, sir.

5    Q    He's got six teeth that have been taken out of the top, for

6    which he has now got a temporary bridge; is that right?

7    A    Uh-huh.  And when he got shot it fractured it, so it's

8    broken off and the food is still being able to sink into his

9    gums and cause infection.

10   Q    And he's got at least another half dozen teeth they want to

11   take out of his lower set; is that your understanding?

12   A    Yes, sir.

13        **MR. BIRDSALL:**  I'll pass this witness, Your Honor.

14        **THE COURT:**  Thank you.  Cross examination.

15                      **CROSS EXAMINATION**

16   BY MR. QUINN:

17   Q    Good morning, Ms. Wayne.

18   A    Good morning.

19   Q    Do you work anywhere?

20   A    Yes.

21   Q    Where?

22   A    McDonalds.

23   Q    McDonalds?

24   A    Yes.

25   Q    Where at?

1   A    On Timberlane.

2   Q    In El Dorado?

3   A    Uh-huh.

4   Q    And was Mr. Wayne working, has he worked since he's been

5   shot?

6   A    We have like we sell jewelry, clothing.  But when the

7   government came to our house in 2011, rumor around town was my

8   husband was running from the government because somebody broke

9   in our store, stole $12,000 worth of merchandise and we was just

10  forced to go to Strong, remove the rest of what we had and we

11  was just selling it from our house, you know, to get our money

12  back what was left.

13  Q    Okay, so I guess your answer then is since 2011 when the

14  store closed, he hasn't worked?

15  A    We still have merchandise, selling it, yes, together.

16  Q    He sells jewelry, merchandise, part-time?

17  A    Shoes, purses, clothes.

18  Q    Okay.  And any idea then how Mr. Wayne would have $25,000

19  cash, approximately, in June of this year?

20  A    I don't know about that.

21  Q    Okay.  Never seen $150,000 underneath y'all's house over

22  there in Wildwood?

23  A    I thought you said it was on somebody else's property.  I

24  never saw that.

25  Q    Never saw that.  You said his medical condition is causing

1  him a lot of pain and discomfort, but you said he's got a job

2  waiting for him detailing 18-wheelers when he gets out.  So are

3  you saying his medical condition isn't so bad that he can't go

4  do a labor intensive job like that; is that right?

5  A    His medical records state what his medical condition is.

6  It tells how he will be in pain for the rest of his life.  It

7  tells about his mental - how it left his mind.  He's not going

8  to be doing anything that severe at the logging company that,

9  you know, he can't sit down and take a break.  That's why

10 they're going to hire him to stay there and not on the road.

11 Q    Your testimony is when - if the judge releases him, he's

12 going to go to work at a logging company detailing trucks; is

13 that what your testimony was?

14 A    Yes.

15 Q    Okay.  And his medical condition wouldn't affect that

16 employment?

17 A    No, he is able to sit down from time to time.

18 Q    All right.

19        **MR. QUINN:**  That's all the questions I have, Judge.

20        **THE COURT:**  Anything further?

21        **MR. BIRDSALL:**  Nothing further.

22        **THE COURT:**  You may step down.

23        **MR. BIRDSALL:**  I simply at this point, Your Honor,

24 want to proffer items.

25        **THE COURT:**  Sure.

1    **MR. BIRDSALL:**  I've got sitting in a brown manila

2    envelope at my table there approximately three to four inches of

3    medical records, and I've actually read them.  The gist of the

4    situation is he will live with chronic pain the rest of his

5    life.  There is a bullet lodged in his right temple and one in

6    his second disc down from the top of his neck.  Both very

7    dangerous places to attempt any further surgical intervention.

8    So the plan right now from the doctors is to monitor it for

9    movement.  If it stays where it is, then it's not worth the

10   cutting, it's not worth the risk.  But if it moves, that can

11   present a whole different scenario.  To assist their efforts in

12   deciding if it is moving or not, they performed various scans,

13   CAT scans since he was shot back in January of this year.

14       I would also proffer that I've seen the dental records and

15   they are consistent with the testimony of Michelle Wayne and the

16   dentist is worried and wants to get finalized what he's started

17   and now been so long delayed in doing.

18       That concludes my proffer, Your Honor, I rest.

19       **THE COURT:**  Mr. Quinn, any final argument or

20   statement?

21       **MR. QUINN:**  Just some argument, Your Honor.

22       Judge, I'm not going to, I guess, quote all the factors

23   that the court has to consider.  The court is well aware of what

24   all of those are.

25       I would just note, Your Honor, that this is a charge that

1  carries with it a presumption of detention, a rebuttal

2  presumption of detention.  Actually, both counts in this

3  indictment do.

4      The evidence, Your Honor, that I believe will be presented

5  is of such a nature that Mr. Wayne is a danger to the community,

6  Your Honor.  Even after him being shot in January, and whatever

7  medical condition he has now, even after that event I think the

8  evidence will show that he is a danger to the community.  That's

9  not only based on just the nature of the charges, Your Honor,

10 the large quantities of narcotics that Mr. Wayne, we believe, is

11 responsible for distributing in South Arkansas, but also the

12 associates that he was involved with and his, the threats that

13 he has made to witnesses in this case, Your Honor, threatening a

14 minor child and his family over money and drugs, Your Honor, I

15 think is evidence this court, I know, will take seriously when

16 determining whether or not Mr. Wayne should be released from

17 custody.

18     So, Your Honor, just a brief review of his criminal history

19 doesn't seem as serious as a lot of defendants we see come

20 through here, Your Honor, I would note the robbery conviction

21 several years ago.  It looks like other than that it's just

22 minor offenses he was convicted of, flight from an officer in

23 2005.  But Your Honor, given the nature of these charges, given

24 the evidence of threatened violence to witnesses in this case, I

25 think that this court should hold Mr. Wayne in custody pending

1    trial in this matter.

2        Thank you.

3            **THE COURT:**   Thank you.

4        Mr. Birdsall, any argument?

5            **MR. BIRDSALL:**   Thank you, Your Honor.

6        The defendant clearly has strong family and lengthy

7    community ties.  I do know about the robbery, I've looked at the

8    PSR and I would say that the fact that he was offered probation

9    means it was probably a shoplift where he brushed past the guard

10   on the way out, but for whatever reason they offered probation

11   and he successfully lived it out.  I guess that would have been

12   - well the conviction occurred about 15 years ago and I guess he

13   ended probation about ten years ago.

14       Since then I see a few misdemeanors, disorderly conduct,

15   disorderly conduct, DWI, criminal trespass, disturbing the

16   peace, flight from officer, I'm not sure what that means.  I

17   want to talk about the flight from the officer for a second.

18   According to the officer who offered this report, my client was

19   to self-report to do 90 days county and failed to self-report.

20   It's difficult to cross examine this.  There's no telling if he

21   showed up an hour later, the next day, we don't know.

22       But we do know this, after a search warrant was run on his

23   house in September of 2011 and he tried to see if there was a

24   warrant, take care of it, he was told don't leave town, and he

25   didn't.  He did not leave town.  He stayed here for 9 months,

1   from September of 2011 until he was arrested in June of 2012.

2   This is not a guy who is going to run.  Where is he going to run

3   to?  He's the guy with two bullets in him.

4        As far as the concern brought up in the government's

5   proffer about this threat, it's very difficult for me to cross

6   examine a proffer.  I don't know who this kid is.  I don't know

7   what, if any, motivation he has to say what he is saying.  I

8   don't know that anything that was done corroborate or prove the

9   truthfulness of this person's allegations.  So, at this point

10  they are nothing more than that, allegations.

11       My client does have a job.  Yes, he is in pain, but he

12  can't stop living.  He has a job if let out.  Michelle Wayne

13  will operate as a custodian.  She will be the eyes and ears of

14  the court.

15       I understand that this is a presumption case.  But the

16  medical proffer and the custodian testimony have overcome this.

17  The fact of the matter is the jail cannot provide for the man

18  the medical needs that he has.  He is in need of scans

19  constantly to make sure there is no shifting of the bullet.

20       And really, what protection can the jail offer against an

21  inmate who might just decide to get it in his head to come up

22  and sucker punch him and punch him right in the temple where

23  that bullet is stilled lodged.  It would kill him.  The jail

24  cannot provide the medical facilities this man needs.

25       Your Honor, we have overcome the presumption.  He is not

1   going anywhere if you decide to give him a bond.  Leg monitor

2   the guy.  They have a home phone, restrict him to the house.  He

3   will make his appearances.  Michelle Wayne will watch over him

4   and report back to the court any suspicion on her part that he

5   is going down the wrong road.

6       Your Honor, this is exactly the kind of guy that a bond

7   should be extended to.

8           **THE COURT:**  Thank you, gentlemen.  I'm going to take a

9   short recess.  I'll be back in about 10 minutes.  We're in

10  recess.

11                          [recess]

12          **THE COURT:**  Mr. Wayne, this is a detention hearing.

13  The sole purpose of this hearing is for me to determine whether

14  there is some condition, or set of conditions, that I can be

15  comfortable with releasing you pending trial in this case.

16      As Mr. Quinn pointed out and Mr. Birdsall pointed out, as

17  well, this is a presumption case is what the lawyers call it.

18  What that means is that because of the charges, these drug

19  charges, they are serious allegations.  Because of those the law

20  orders me to presume you should be detained.  You can overcome

21  that presumption in certain instances, and that is what Mr.

22  Birdsall is attempting to do in his presentation.

23      Now there are two factors, actually two things that I have

24  to consider here.  They are separate things: The first is the

25  issue of whether or not you're a risk to appear, or to not

1  appear, I should say, a risk of flight.  The second factor, the

2  second thing to consider is whether you would be a danger to the

3  community if you were released.  That presumption applies to

4  both of those things.

5      As to the first one, fleeing, I think the defendant has

6  overcome the presumption of risk of flight in this case.  It

7  means a lot to me, as judge, and it meant a lot to me as a

8  lawyer, when I was a lawyer, that you have such a large family

9  that comes into court today.  Your wife testified.  Ms. Wayne

10  indicated your mom and dad were here along with a lot of other

11  family members.  You've lived here most of your life and you

12  have children that still live here.  Essentially, you're a

13  lifelong resident of El Dorado.  So I think there's not a real

14  danger that you would flee, so I think you've overcome that

15  presumption.

16      But the real issue, Mr. Wayne, is the issue of danger to

17  the community here.  The law gives me some factors to go over

18  when making that determination.  I'm going to go over these with

19  you.

20      The first factor for me to consider in determining whether

21  you are a danger to the community is the nature of the charges

22  here.  Specifically, the statutes and the law says that if the

23  statues or the allegations are that you committed a drug

24  offense, or that you've been involved in a violent crime, then

25  that factor, that fact weighs in favor of keeping you in

1   custody.  In this case you're charged with a drug offense.  So

2   the first factor that I consider weighs in favor of keeping you

3   in custody.

4       The second factor here is the weight of the evidence

5   against you.  Mr. Birdsall points out he didn't have a chance to

6   cross examine witnesses today.  That's often the case in bond

7   hearings, detention hearings.  Because you're family is here, to

8   let them know, the rules of evidence don't apply in these

9   detention hearings.  So what can happen, happens.  The

10  government can make a proffer and they can tell me what the

11  evidence is.  Your lawyer can make a proffer.  He did that to

12  some extent.  He can tell me what the evidence is.  That takes

13  away from the lawyer's ability to cross examine witnesses.

14  That's just the nature of the beast.  That's just what the law

15  is and that's what we do.

16      So the weight of the evidence here, I've got to consider

17  that.  The first thing I think about is there's an indictment

18  against you in this case.  That indictment means that there is

19  probable cause you committed these offenses.  It's not enough to

20  convict you, but it's enough to get you charged.  So that

21  indictment means that you probably committed these offenses.

22      Then I have the proffer of the government here that states

23  from at least, I think - as my notes show, Mr. Quinn says he has

24  at least five confidential sources who testified to various

25  things, or who would testify to various things, I should say,

1   involving anywhere from a thousand grams of crack cocaine to 100

2   ounces of crack cocaine, to $250,000 worth of powder cocaine,

3   and then to a delivery, an undercover delivery of 7 kilos of

4   cocaine to one of your associates, and ultimately to you, at

5   which time you were arrested.  So those are the facts that I

6   have.

7        Again, when I say facts, I say that rather loosely because

8   this is a proffer from the government.  It wouldn't be proper in

9   a trial, but for purposes of today, it is proper.  And so the

10  facts that I have before me today indicate that you probably

11  committed this crime, in fact, a very serious crime based upon

12  the proffer that I have. So that second factor, the weight of

13  the evidence, indicates to me that you should be detained.

14       The third thing is what I sort of talked about a minute

15  ago.  Your family history, those sorts of things.  Your family

16  ties, your employment, all those things.  Those things are in

17  your favor.  That's your history and characteristics as a

18  citizen in this county.

19       Your criminal history, although it's relatively lengthy,

20  it's relatively minor.  So that is not a huge issue, as well.

21  So that third factor tends to weigh in favor of you being

22  released.

23       So then I come to the fourth factor.  The fourth factor is

24  really the most important in my view, it always is, and that is

25  the nature of the danger that you would pose to the community.

I want to tell you this, Mr. Wayne, the law in this circuit is that the act of selling or distributing controlled substance, particularly crack or cocaine, or any of those other sorts of drugs, is by law considered a danger to the community.  So that factor weighs against you.

Further in this case, the proffer from the government is that at least on one occasion, you personally threatened and caused to be threatened a minor who you believed had possession of some of your money and perhaps some of your controlled substances.  And again, I know you disagree with that, but that's the evidence that I have before me today.  And so that factor of the nature and seriousness of the danger to the community weighs in favor of keeping you in custody without bond.

So when I consider all those things, it is apparent to me that you have not overcome the presumption that the law provides regarding danger to the community.  It is going to be the finding of the court, by clear and convincing evidence, there is no condition or set of conditions, that I can impose upon you that would ameliorate, or lessen the danger to the community in this case.  Because of that, I'm going to order that you be detained pending trial without bond in this matter.

You will be remanded to the custody of the United States Marshals pending the trial in this case, or until such other and further order of this court.

1    Is there anything further from the government in this

2  matter?

3         **MR. QUINN:**  Not from the government.

4         **THE COURT:**  Anything further on behalf of the

5  defendant in this case?

6         **MR. BIRDSALL:**  I don't know if the court has any sway

7  on this, but I would ask that he be returned to the Texarkana

8  jail to make him more easily accessible to counsel.

9         **THE COURT:**  Will that be  possible to do?  He will be

10 detained in Texarkana.

11    Anything further?

12        **MR. BIRDSALL:**  No.

13        **THE COURT:**  Then we're in recess.

14

15

16

17

18

19

20

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3        I, Donna S. McKinney, CCR-CVR, certify the foregoing is a

4   correct transcript from the record of the proceedings in the

5   above-entitled matter.

6        DATED this 27th day of March, 2013.

7

8                              /s/ *Donna S. McKinney*
                               Donna S. McKinney, CCR-CVR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25